IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF DAWSON B. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF DAWSON B. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JESSICA B., APPELLANT, AND KOLTEN B. AND SEAN B., APPELLEES.

Filed June 24, 2025.    Nos. A-24-744 through A-24-747.

Appeals from the County Court for Adams County: TIMOTHY E. HOEFT, Judge. Affirmed.

Tana M. Fye, of FGH Law Office, L.L.C., for appellant.

Cassie L. Baldwin, Deputy Adams County Attorney, for appellee State of Nebraska.

Carson K. Messersmith, of Klein, Brewster, Brandt & Messersmith, for appellee, Kolten B.

PIRTLE, BISHOP, and WELCH, Judges.

PIRTLE, Judge.

### INTRODUCTION

Jessica B. appeals the order of the Adams County Court, sitting as a juvenile court, terminating her parental rights to her four minor children. Kolten B. cross-appeals the same order terminating his parental rights to two of the four children. A separate case was filed for each child in juvenile court and the juvenile court entered one order on termination of parental rights. Jessica and Kolten filed separate appeals for each case. The appeals have been consolidated for disposition. Upon our de novo review, we affirm the juvenile court's order.

- 1 -

BACKGROUND

Jessica is the mother of Ayden B., born June 2010; Kennith B., born November 2012; Colton B. (C.J.), born December 2013; and Dawson B., born March 2016. Kolten is the father of C.J. and Dawson. Sean B. is the father of Ayden and Kennith. Sean is not part of this appeal.

All four children were removed from Jessica and Kolten's home on November 8, 2022. At the time of removal, Jessica, Kolten, and the four children were living in a house in Hastings, Nebraska. Sean and another adult male were also staying at the house. Jessica and Kolten had been married for 9 years at the time of the termination hearing.

On November 10, 2022, the State filed petitions to adjudicate Ayden and Kennith, as to Jessica, and C.J. and Dawson, as to both Jessica and Kolten, pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The petitions alleged that Jessica and Kolten were unable to provide proper parental care for the children. They further alleged the children were removed from the home by police officers due to safety concerns because Jessica was using "duster" (huffing compressed air) to get high and was unavailable to take care of the children, and in addition, a fight had occurred in the home between Sean and the other adult male staying at the home with the children present, that resulted in one of the individuals being hospitalized.

On January 24, 2023, the court entered orders adjudicating all four children as to Jessica, and C.J. and Dawson as to Kolten, pursuant to § 43-247(3)(a). Multiple case plans followed and services were provided to Jessica and Kolten to work toward reunification, but the children remained out of the home.

On March 7, 2024, the State filed supplemental petitions to terminate the parental rights of Jessica and Kolten to their respective children, alleging statutory grounds existed under Neb. Rev. Stat. § 43-292(2), (3), (6) and (7) (Reissue 2016), and that termination was in the children's best interests.

A termination hearing was held in August 2024. Evidence was presented including testimony from numerous witnesses and the receipt of multiple exhibits.

The caseworker who did the initial intake for the Department of Health and Human Services (DHHS) testified that this was not the first time this family had been involved with DHHS or the juvenile court. There were three previous juvenile court cases and two non-court cases. The first court case was from June 2014 to September 2015, the second was from November 2016 to April 2017, and the third was from June 2017 to August 2019. The children were removed from the home in all three cases.

The first court report and case plan prepared in this case had three goals for Jessica and one for Kolten. The first goal for Jessica was to refrain from using "duster" or other huffing products in order to care for her children. Her second goal was to provide a safe and stable home, free of domestic violence, where the children's basic needs are met. Jessica's third goal was to take care of her mental and physical health so she could take better care of her children. Kolten's goal was to provide a safe and stable home, free of domestic violence, where the children's basic needs are met. DHHS offered services to help achieve these goals including supervised visitation, family support services, drug testing, and psychological testing. The purpose of family support service was to help the parties obtain housing and employment and work on budgeting.

Glenda Mullen, the caseworker from the end of November 2022 to October 2023, testified that Jessica and Kolten made little to no progress on their case plan goals. During this timeframe, both parties were having supervised parenting time. At first, both parties were attending parenting time consistently, but after the parties moved to Overton, Nebraska, in May 2023, Kolten's attendance became sporadic. There were also concerns during the visits, such as Jessica having inappropriate discussions with the children, unsupervised conversations with the children, and not being receptive to redirection. In December 2023, Jessica and Kolten's supervised visits were reduced from twice per week to once per week.

During the time Mullen was the caseworker, she made referrals for family support services, drug testing, and supervised parenting time. Mullen testified that in November or December 2022, she made a referral for family support services for Jessica but the referral was returned because the provider was unsuccessful in implementing the service with Jessica. In June 2023, Mullen made a referral for family support services for both parties, but neither one participated. Referrals for family support services and drug testing in August 2023 were returned to Mullen 2 weeks later because the service provider was unable to contact Jessica.

Jenny Scott, the caseworker from October 2023 until the termination hearing in August 2024, testified that the goals and strategies in the case plan substantially remained the same throughout the case. DHHS continued offering services to help Jessica and Kolten achieve the case plan goals, but little to no progress was made.

Between October 2023 and February 2024, Jessica failed to consistently participate in drug testing, and when she did submit to a test, she occasionally tested positive for alcohol and consistently tested positive for THC. The test results did not distinguish between legal forms of THC and marijuana. In February 2024, the drug testing laboratory was asked to determine the type of THC found in Jessica's test results. From February 2024 to May 2024, Jessica consistently tested and there were positive test results for alcohol and for marijuana.

Between October 2023 and February 2024, Jessica participated in some family support sessions, but did not participate consistently. Kolten did not participate in family support during that time. In March 2024, Scott made a new referral for family support services and Jessica and Kolten participated in two sessions between March and May. The family support provider contacted the parties each week to set up a session but Jessica and Kolten told her they were too busy with work to schedule a time or they would not respond to the provider's calls.

In April 2023, Jessica was ordered to have a drug and alcohol evaluation and a psychological evaluation. She had a psychological evaluation in the fall of 2023 and the results recommended that she work with a trauma therapist and that no family therapy occur until she accepted responsibility for her behaviors that led to the children's removal. Jessica did not set up trauma-based therapy, nor did she sign a release so her caseworker could view her evaluation. At the time of the termination hearing, she had not received any inpatient or outpatient services for her mental health.

Jessica completed a drug and alcohol evaluation in February 2024. The results recommended outpatient counseling with a therapist, preferably one who specialized in working with trauma. Jessica did not follow through with any recommendations from the evaluation and the individual who conducted the evaluation was unable to obtain collateral information from DHHS in preparing her report because Jessica did not sign a release of information.

In February 2024, Jessica's supervised parenting time with C.J. and Dawson was changed from 20 hours per week to 4 hours per week because she was discussing the case with the children and talking about them coming home even after she had been redirected on multiple occasions to not talk about these topics. These conversations resulted in negative behaviors by C.J. and Dawson after visits. Jessica's last parenting time with C.J. and Dawson was in May 2024.

Jessica has not had parenting time with Ayden since September or October 2023. His therapist recommended that no parenting time take place. Ayden told his therapist that he was tired of being pulled in and out of his home, and tired of returning home wondering if this time he would get to stay home, and then getting removed again. In January 2024, he told his therapist that he did not want to go back home because he did not believe his parents could take care of him.

Jessica has not had visitation with Kennith since October 2023. He was placed at Boys Town from October 2023 to May 2024 due to aggressive behavior and his therapist recommended no communication with Jessica. After Kennith was released from Boys Town his therapist believed that contact between Kennith and Jessica would be detrimental to Kennith's healing and growth.

Jessica was incarcerated at the time of the termination hearing for assault. Her incarceration began in May 2024 and she was scheduled to be released in October 2024. Kolten participated in two family support sessions after Jessica was incarcerated. Kolten regained parenting time with C.J. and Dawson after Jessica was incarcerated and he was having parenting time at the time of the termination hearing.

Throughout the case, the parties' living situation changed numerous times and was never stable. When the children were removed from their home, the parties were renting a house. In January 2023, they were evicted from the house. After being evicted, Jessica and Kolten moved in with Kolten's boss. In March, they moved into a motel; in May, they moved in with a friend who lived in Overton; and in September they moved into a motel in Kearney, Nebraska. At some point after that, the parties moved back to Hastings, but the caseworker was unaware of the address.

Scott testified that between October 2023 and August 2024, the parties did not secure housing and she did not know where they were living. Jessica and Kolten both told her they were periodically living in and out of Kolten's truck but did not indicate where they were staying otherwise.

Jessica and Kolten both testified that Kolten was looking for housing for the two of them. Jessica testified that DHHS had not provided any assistance in finding housing. She also testified that DHHS also had not aided her in obtaining and maintaining employment, or in setting up and maintaining therapy.

Jessica's employment has been limited throughout the case. She was unemployed when the case started. Mullen testified that during her time as the caseworker Jessica was only employed for 2 or 3 months. Scott testified that to her knowledge, Jessica was not employed at all during her time as the caseworker.

Jessica testified that she was employed at an auto shop just before the children were removed. She testified that her next job was working at a motel, followed by another auto shop, where she worked for about 3 months. Since then, Jessica claimed she had been working with Kolten at his landscaping business. She further explained that her ability to work had been limited by physical injuries she suffered from an assault in September 2023. She had several surgeries due

to her injuries, the most recent being in April 2024. She also suffered a traumatic brain injury and had post-concussion syndrome.

Kolten was employed from the time the children were removed until March 2023, when he lost his job. After that, he started his own landscaping business.

Luke Yellow Robe, a member of the Rosebud Sioux Tribe and affiliated with the Oglala Sioux Tribe through his mother, was asked to testify because the Indian Child Welfare Act (ICWA) applied to the case. The children were eligible to be enrolled in the Oglala Sioux Tribe because Kolten and Sean were enrolled members in the Tribe. Yellow Robe had been a facilitating consultant/qualified expert witness on behalf of ICWA for jurisdictions across the county for over 20 years. He had been designated by Oglala Sioux Tribe as a qualified expert witness in ICWA matters. Yellow Robe testified he had significant knowledge regarding the child-rearing practices of the Oglala Sioux Tribe and was familiar with the social and cultural standards of the Tribe.

Yellow Robe was provided with and reviewed case plans and court reports, various documentation pertaining to visitation, and drug testing results from the case. He testified that after reviewing all the information that had been given to him, he believed DHHS had made active efforts to provide services to prevent the breakup of the family.

Yellow Robe also testified that he believed continued custody and parenthood of the children by Jessica and Kolten "would be beyond injurious. I believe it would be dangerous." He further testified that the record clearly showed the lack of effort by Jessica and Kolten to be reunified with the children. In addition, he stated "I just think it would be dangerous to return these children to the instability we are seeing and the behaviors we are seeing with [Jessica] and the lack of involvement from [Kolten]."

Yellow Robe also opined that terminating Jessica and Kolten's parental rights was in the best interests of the children. Regarding Kolten specifically, he testified that his rights should be terminated based on his lack of involvement, failure to follow the case plan, and failure to work with DHHS toward reunification.

Other witnesses testified that the termination of Jessica's and Kolten's parental rights was in the children's best interests. Mullen gave her opinion that termination was in the children's best interests based on the poor progress of the parties. Scott testified that in her opinion it was in the best interests of the children to terminate Jessica's and Kolten's parental rights based on the behaviors exhibited by the parents, to include prolonged drug and alcohol use, erratic behaviors, lack of parenting skills, lack of progress, and failure to provide for and protect the children. C.J.'s therapist from March 2023 to June 2024 believed it was in C.J.'s best interests to terminate Jessica and Kolten's parental rights because consistency and security is important for a child's development and she did not believe Jessica and Kolten could meet those needs. Her opinion was based on the parties' lack of progress and the amount of time C.J. has been under the jurisdiction of DHHS.

The juvenile court entered its order on September 5, 2024, terminating Jessica's and Kolten's parental rights. It found that all the statutory grounds alleged had been met and the termination of parental rights was in the children's best interests. The court also found that the State proved by clear and convincing evidence that active efforts were made to prevent the breakup of the family and that these efforts were unsuccessful, and that continued custody of C.J. and

Dawson in Kolten's custody, and continued custody of all four children in Jessica's custody, was likely to result in serious emotional or physical damage to the children.

## ASSIGNMENTS OF ERROR

On appeal, Jessica assigns that the juvenile court erred in (1) finding the State proved active efforts had been made to prevent the breakup of the Indian family and that those efforts were unsuccessful, (2) terminating her parental rights without finding beyond a reasonable doubt supported by qualified expert testimony that the children's continued custody by the parties was likely to result in serious emotional or physical damage to the children, and (3) finding her unfit and that termination of her parental rights was in the children's best interests.

On cross-appeal, Kolten alleges the same assignments of error as Jessica regarding his parental rights to C.J. and Dawson.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

*Kolten's Cross-Appeal.*

At the outset, we note that Kolten failed to comply with the rules regarding cross-appeals. See Neb. Ct. R. App. P. § 2-109(D)(4). Jessica was the first party to file a notice of appeal in each case, and therefore, she was the appellant. Pursuant to Neb. Ct. R. App. P. § 2-101(C), once a notice of appeal is filed, all other parties become appellees and can file a cross-appeal.

As a cross-appellant, Kolten was required to comply with the rules for cross-appeals, including the requirement that he designate on the cover of his brief that it is a cross-appeal, and set forth his cross-appeal in a separate division of the brief entitled "Brief on Cross-Appeal." See § 2-109(D)(4). Kolten failed to meet either of these requirements.

In *In re Interest of Steven S. et al.*, 27 Neb. App. 831, 936 N.W.2d 762 (2019), this court set forth a detailed analysis of cases involving non-compliance with § 2-109(D)(4). We noted cases in which an appellate court has considered alleged errors of an appellee despite failure to comply with § 2-109(D)(4). See, *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019) (mother filed "Brief of Appellee on Cross Appeal," prepared brief in form of appellant's brief, but did not separately respond to father's appellant's brief other than to accept his statement of basis of jurisdiction and statement of case); *Knaub v. Knaub*, 245 Neb. 172, 512 N.W.2d 124 (1994) (appellee designated himself on cover of brief as appellant rather than as appellee/cross-appellant). In contrast, we noted cases where our appellate courts declined to waive the rules and address the assigned errors of the purported cross-appellant. See, *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999); *In re Interest of Chloe P.*, 21 Neb. App. 456, 840 N.W.2d 549 (2013) (parent titled brief as that of appellee, did not designate cross-appeal on cover page or set forth separate division of brief as cross-appeal yet sought

affirmative relief). The distinction noted in *In re Interest of Steven S. et al., supra*, is whether the cover and content of the brief puts an appellate court on notice that a party is seeking affirmative relief, whether identifying as an appellant or a cross-appellant.

Here, Kolten does not properly designate the cover of his brief as a cross-appeal, nor does his brief contain a separate section for the cross-appeal as required by § 2-109(D)(4). Rather, he prepared his brief in the form of an appellant's brief as set forth in § 2-109(D)(1), and did not separately respond to Jessica's appellant's brief. We recognize that if an appellee and cross-appellant's position aligns with the appellant's position, as is often the case in parental termination cases, there is usually no need to separately respond as an appellee. See *In re Interest of Hope M. et al.*, No. A-21-155, 2021 WL 4572183 (Neb. App. Sept. 28, 2021) (selected for posting to court website).

Kolten is seeking reversal of a final order, and his interests are not adverse to those of Jessica. It is evident from his brief that he is seeking affirmative relief. As defined by Neb. Rev. Stat. § 25-1913 (Reissue 2016), he is more akin to an appellant than an appellee. Accordingly, we treat Kolten's brief as a brief on cross-appeal. See § 2-109(D)(4) (where appellee submits brief purporting to be brief of appellant, which complies with rules regarding an appellant's brief, and appellee's brief does not take issue with any errors asserted by appellant, appellate court may, in its discretion, treat brief of such appellee as brief on cross-appeal).

*Nebraska Indian Child Welfare Act (NICWA).*

Jessica's and Kolten's first two assignments of error relate to the State's compliance with NICWA. NICWA implements ICWA in Nebraska and the relevant language of both acts is largely the same. See *In re Interest of Ricardo T. et al.*, 315 Neb. 718, 999 N.W.2d 562 (2024).

The four children, through their fathers, are eligible for membership in the Oglala Sioux Tribe. As such, the provisions of NICWA applied to them. To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024).

NICWA adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. *In re Interest of Cameron L. & David L., supra.* First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. *Id*. See Neb. Rev. Stat. § 43-1505(4) (Reissue 2016). Second, the State must prove by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. *In re Interest of Cameron L. & David L., supra*. See § 43-1505(6).

Jessica and Kolten first assign that the juvenile court erred in finding the State proved active efforts had been made to prevent the breakup of the Indian family and that those efforts were unsuccessful. The State presented the testimony of Yellow Robe, a member of the Rosebud Sioux Tribe and affiliated with the Oglala Sioux Tribe through his mother. He had been designated by the Oglala Sioux Tribe as a qualified expert witness in ICWA matters. He had testified as a qualified expert witness for the Oglala Sioux Tribe on multiple occasions in Nebraska, South Dakota, and other states. Yellow Robe had significant knowledge regarding the child-rearing

practices of the Oglala Sioux Tribe and was familiar with the social and cultural standards of the Tribe.

Regarding the present case, Yellow Robe testified he had reviewed case plans and court reports, and various documentation pertaining to visitation and drug testing throughout the case. After reviewing all the information he had been provided, he believed DHHS had made active efforts to provide services to prevent the breakup of the family. In addition to Yellow Robe's testimony, there was evidence, as set out above, of the efforts the State made to offer services to help prevent the breakup of the family, which also met the requirements of active efforts, and that those efforts were unsuccessful.

Jessica and Kolten next assign that the juvenile court erred in terminating their parental rights without finding beyond a reasonable doubt, supported by qualified expert testimony, that the children's continued custody by the parties was likely to result in serious emotional or physical damage to the children. The parties do not argue that Yellow Robe was not a qualified expert witness. Rather, they argue that Yellow Robe's testimony was insufficient to support a finding that the children's continued custody by the parties was likely to result in serious emotional or physical damage to the children.

Yellow Robe was asked if he had an opinion within a reasonable degree of certainty as to whether continued custody and parenting of the four children by Jessica and Kolten would likely result in serious physical and/or emotional harm to them. He responded that he had an opinion and he believed continued custody and parenthood of the four children by Jessica and Kolten "would be beyond injurious. I believe it would be dangerous." He further stated the lack of effort by the parents to be reunified with the children was apparent from the record. In addition, he stated, "I just think it would be dangerous to return these children to the instability we are seeing and the behaviors we are seeing with [Jessica] and the lack of involvement from [Kolten]." Therefore, we agree with the juvenile court that there was sufficient evidence to prove the second additional NICWA element. Jessica's and Kolten's first two assignments of error fail.

*Statutory Grounds for Termination.*

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). The State must prove these facts by clear and convincing evidence. *Id.*

Jessica and Kolten do not assign that the court erred in finding that statutory grounds existed under § 43-292(2), (3), (6), and (7). However, for the sake of completeness, we set out how § 43-292(7) was met.

Subsection (7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Becka P. et al., supra.* In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests' step of the analysis. *In re Interest of Becka P. et al., supra.*

The children were removed from the home on November 8, 2022. Since the day they were removed, they have never returned to either party's care and have remained in out-of-home

placement. At the time the State filed the supplemental petitions to terminate parental rights on March 7, 2024, the children had been placed outside the home for 17 months out of the most recent 22 months. Therefore, the children had been out of the home for more than 15 of the most recent 22 months; the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al., supra.* Because we find that the State presented clear and convincing evidence that a statutory ground to terminate existed under § 43-292(7), we need not address the other statutory grounds.

*Parental Unfitness and Best Interests.*

Jessica and Kolten assign that the juvenile court erred in finding that it was in the children's best interests to terminate their parental rights.

Under § 43-292, in addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts. *Id.*

The evidence showed that the parties made little to no progress in complying with the case plan goals, despite services being offered. Throughout the case, Jessica and Kolten were offered supervised visitation and family support services, and in addition, Jessica was offered drug testing and psychological and drug evaluations.

Regarding visitation, the number of weekly visits for Jessica and Kolten were reduced in December 2023 due to inappropriate behavior by Jessica. In February 2024, Jessica's visitation hours with C.J. and Dawson were reduced because she was having conversations with them about the case. She has not had parenting time with C.J. and Dawson since going to jail in May 2024. Jessica has not had parenting time with Ayden and Kennith since the fall of 2023. Kolten's attendance at visits throughout the case was consistent at times and sporadic at other times.

Neither party has had safe and stable housing since they were evicted from their home in January 2023. Since then, Jessica and Kolten have lived with Kolten's boss and a friend, stayed in motels, and lived in Kolten's truck. There were times when the caseworker did not know where Jessica and Kolten were living. At the time of the termination hearing, Jessica was incarcerated. Kolten was living in an apartment with Sean and another individual, but it was not a long-term

housing arrangement. Kolten and Jessica both testified that Kolten was "actively looking" for housing but nothing had been secured.

Both parties' employment has been uncertain. Jessica claimed she was working for Kolten at his landscaping business but neither of her caseworkers were aware of that and believed she was unemployed. Mullen testified that during her time as the caseworker Jessica was only employed for 2 or 3 months. Scott testified that to her knowledge, Jessica was not employed at all during her time as the caseworker. Jessica was unemployed when the case began. Kolten was employed when the case started but then lost his job in March 2023 and started his own landscaping business. There was no evidence as to whether the business was profitable or not.

Jessica claimed that DHHS had not helped her find housing or employment but there were multiple referrals made for family support services. The purpose of family support was to help Jessica and Kolten obtain housing and employment, as well as work on budgeting. Family support services were discontinued several times because either the provider could not contact Jessica or she did not participate in the services. At other times Jessica did not consistently participate. She and Kolten also told one service provider they were too busy to set up appointments, and other times they would not respond to calls. There were also at least two referrals for family support services where Kolten chose not to participate in the services.

Regarding Jessica's drug testing, she was consistent with getting tested at times and inconsistent at other times. She occasionally tested positive for alcohol and consistently tested positive for THC. Starting in February 2024, it was determined that her positive THC tests were for marijuana.

Jessica was also ordered to take care of her mental and physical health. She had a psychological evaluation and a drug and alcohol evaluation but did not follow through with the recommendations. Scott testified that Jessica had not received any inpatient or outpatient services for her mental health.

The parties and the children have been involved with DHHS and the juvenile court off and on since 2014. The children were removed from Jessica and Kolten's home on three prior occasions.

Finally, there was testimony from multiple witnesses that terminating Jessica's and Kolten's parental rights to their respective children was in the children's best interests.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Id.* Jessica and Kolten have failed to put themselves in a position to properly parent the children. The children have been suspended in foster care since November 2022 in this case and have a lengthy history of involvement with DHHS and the juvenile court. It appears Jessica and Kolten will not become fit and capable parents any time soon. The children deserve stability and security in their lives. They should not be suspended in foster care when Jessica and Kolten are unable to rehabilitate themselves. Accordingly, based on our review of the evidence, we agree with the juvenile court that Jessica and Kolten were unfit and that terminating their parental rights was in the children's best interests.

## CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds to terminate Jessica's parental rights to Dawson, C.J., Ayden, and Kennith, and Kolten's parental rights to Dawson and C.J., existed under § 43-292(7) and that termination of their parental rights was in the children's best interests. The juvenile court's order is affirmed.

AFFIRMED.